Filed 8/17/15  P. v. Mundy CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

S TATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW MICHAEL MUNDY,<br><br>    Defendant and Appellant. | D065113<br><br><br><br>(Super. Ct. No. SCD246439) |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

During the span of four months, Andrew Mundy forced entry into four separate homes, ransacked them, and stole numerous valuable items from multiple victims.  A jury

convicted him of four counts of first degree burglary and one count of unlawful driving or taking a vehicle.  (Pen. Code,[1] §§ 459, 460; Veh. Code, § 10851, subd. (a).)  Mundy waived his jury trial right on the prior allegations, and the court found true that Mundy had two prior serious felony (strike) convictions, a prior vehicle theft conviction, and a qualifying prior prison term.

After denying Mundy's motion to strike the prior strikes, the court sentenced Mundy under the Three Strikes law to a total prison term of 100 years to life plus 44 years.  Mundy challenges this sentence on appeal.  He contends the court abused its discretion in refusing to dismiss his prior strikes, and the sentence constitutes cruel and unusual punishment in violation of the federal and state Constitutions.  We reject these contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.  *Evidence of Current Offenses*

Although the appellate issues concern only sentencing, we set forth the facts underlying the current convictions because those facts were relevant to the court's sentencing decision.

A.  *February 2012 Offenses*

The jury found Mundy committed three residential burglaries in February 2012.

First, on February 18, Galen Justice returned home about 8:30 p.m. and found her house in complete disarray with numerous valuable items missing.  Her kitchen cabinets

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

were open; items were taken out of drawers; drawers were thrown on the floor; and her belongings were strewn about the house. In her bedroom, a dresser was knocked to the floor and her clothes were removed from her closet. A screen was torn from her living room window, and the window's glass louvers had been removed. Her garage door opener mechanism had been disabled. The missing items included a laptop, jewelry box, valuable jewelry, personal checks, clothing, shoes, watches, luggage, laundry baskets, binoculars, gift cards, and wine bottles. Police collected a towel left at the scene and tested it for DNA. Mundy's DNA matched the predominant DNA on the towel.

The same day, Jordan Levine (who lived with three roommates) returned to his house about 4:00 p.m. and discovered it had been burglarized. Someone had rummaged through every room in the house and stolen items from all four roommates. The cabinets and dresser drawers were open; Levine's and his roommates' belongings were out of place and strewn all over the floor; and items that were stored in the garage were moved into the living room. The stolen items included a safe, two laptops, DVD's, CD's, a camcorder, a gaming console, two watches, clothes, a backpack, luggage, and two pairs of shoes. Levine found a folding knife on his bed that did not belong to him or his roommates. Police collected the knife and tested it for DNA. Mundy was a predominant contributor of the DNA on the knife.

The next day, Thomas Richardson returned home from a weekend trip with his children and found his home had been ransacked. His tax documents were knocked off his dining room table; his belongings were strewn about the floor; his cabinets were open; and wall-hanging pictures had been displaced. In his daughter's room, pillows were

3

missing and a dresser was pulled away from the wall with a drawer left open. Numerous items were also displaced in his room and his son's room.

The property stolen from Richardson's home included jewelry that had belonged to his mother and grandmother, a sterling silver set that had been in his family for several generations, valuable coins, expensive watches, a television, his son's game console, books, and vases. Police found an open water bottle containing a palm print that matched Mundy's palm print, and a cigarette butt with DNA for which Mundy was a possible major contributor.

## B. *June 2012*

About four months after the Justice, Levine, and Richardson burglaries, on June 11, William Wagner discovered his Mazda vehicle was missing from the parking garage of his apartment complex. He reported the stolen vehicle to the police.

Two days later, Liza Dutcher returned to her home and discovered her home had been ransacked. All the cabinets were open; a printer was smashed on the floor; and Dutcher's and her roommate's belongings were strewn over the floor. Dutcher's room was emptied out; someone had stolen her flat screen television, digital camera, iPod and accessories, camera charger, and all her clothes, shoes, jewelry, purses, and perfume. In her roommate's room, an armoire full of clothes was emptied, and other items were stolen including jewelry, keys, a television, a computer, a backup hard drive, an external hard drive, an iPod, a wallet, and a printer.

The next day, a deputy sheriff spotted Wagner's stolen car on the road. He followed it a short distance to a strip mall. Mundy parked the car, and entered a

4

convenience store. When Mundy returned, the deputy detained and arrested him. Officers searched the car and found tools, a shaved key, and numerous items that were later identified by Dutcher and her roommate as their property.

## II. *Jury Verdict and Court Findings on Priors*

A jury found Mundy guilty of four counts of first degree burglary (§§ 459, 460), and one count of unlawful taking or driving a motor vehicle (Veh. Code, § 10851, subd. (a)). The court found Mundy had a prior theft conviction (§ 666.5, subd. (a)), two prior strike convictions (§§ 667, subds. (b)-(i), 668, 1170.12), two serious felony prior convictions (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one qualifying prior prison term (§§ 667.5, subd. (b), 668).

## III. *Sentencing*

At the sentencing hearing, the court considered the probation report, the prosecution and defense written statements, numerous letters in support of Mundy, and the oral statements of Mundy, one victim, and several Mundy supporters.

The probation report summarized 33-year-old Mundy's criminal history, which began when he was a juvenile. From ages 14 to 17, Mundy committed numerous offenses, including burglary, petty theft, possession of stolen property, and vandalism. In 2003, when he was 22, Mundy pled guilty to drug possession offenses and driving under the influence. Shortly after, he pled guilty to burglary. In 2004, he committed his first and second strike offenses (first degree residential burglaries), and was committed to prison for four years. After being released from prison, Mundy was convicted of driving under the influence in 2008, and two years later in 2010 was convicted of a misdemeanor

5

battery. Two years later, he committed the five current offenses during a four-month period while on summary probation.

The probation officer recommended the court impose a sentence of 100 years to life plus 53 years. This recommended sentence consisted of 25 years to life for each first degree burglary count (under the Three Strikes law), and two five-year serious felony enhancements for each 25-year-to-life term (§ 667, subd. (a)(1)); plus nine years on the stolen vehicle count; plus one additional year for each residential burglary for the prison prior (§§ 667.5, subd. (b), 668).

The prosecutor agreed with this recommendation. He argued that Mundy made a deliberate choice to continue his criminal activities, despite knowing the likely consequences. He asserted that Mundy "clearly demonstrated that he is unable to remain law abiding, that he willfully disobeys court orders, [and] he is a threat to the security of others in their homes . . . ." He further noted that Mundy declined to enter into plea bargain discussions early in the process, and made a deliberate decision to take his chances at trial despite the strong evidence linking him to the crimes.

At the sentencing hearing, victim Richardson explained the burglary's devastating emotional and financial consequences to his family, including his son and his elderly father (who had since passed away). Richardson told the court that although the burglary occurred two years ago, it continues to affect his family. Richardson said Mundy stole more than $140,000 in property from his home and none of this property has been recovered; his son continues to manifest a heightened fear and insecurity at home; and a

6

woman was recently arrested with Social Security information that had been stolen from his home.

Mundy opposed the requested sentence. He asked the court to strike his prior strikes and impose a 17-year sentence. At the sentencing hearing, defense counsel stated that Mundy understood he "is going to have to pay the price" for his "bad decisions," but asked the court to "consider a significant determinate term rather than a life sentence" to provide him "an ability to be a productive member of society." Counsel stressed Mundy's strong family support and that his crimes resulted from his drug addiction. Counsel also emphasized that Mundy's strike convictions occurred seven years earlier and he has not had a felony conviction since that time. Counsel additionally highlighted the facts that Mundy has no history of violence (except for his 2010 battery) and no one was injured during the current crimes.

Mundy also submitted more than 20 letters from family members and members of the Word of Life Worship Center (Church). Many of these supporters were present at the sentencing hearing and several spoke at the hearing.

In the letters and oral presentations, Mundy's family portrayed him as a devoted son, husband, and father, and discussed Mundy's positive influence on the lives of his children and stepchildren. According to the Church members, Mundy joined the Church shortly after he committed the February 2012 burglaries, but before committing the June 2012 crimes. The Church and family members described Mundy as a devoted religious person who had performed good deeds for others and was committed to improving his life. Many acknowledged Mundy's past drug addiction problems, but stated he appeared

7

to have made changes in his life and emphasized Mundy's giving and charitable nature. They detailed how Mundy has been attending services and helping with Church activities, including volunteering to help the homeless and other needy individuals. A treatment counselor from the East County Regional Recovery Center provided a letter stating that Mundy "has been regularly attending" drug treatment programs and parenting classes since November 21, 2011. Counsel also presented evidence that Mundy had maintained a construction job during the last few years.

At the hearing, Mundy apologized to the court, the victims, and his family, stating he realized he "made some bad choices." He said: "[It is] time for me to be a better man and make better decisions. . . . [¶] I came into jail trying to turn from Christianity. I went backwards. I have made bad choices in jail as well. I do need more time to reflect and become a better man in society as well as to my family. I can't put nobody else through this or the community."

After considering all of the written and oral submissions and argument, the court denied Mundy's request to strike the prior strikes. The court explained its reasoning in part:

> ". . . I have been asked to consider striking Mr. Mundy's strikes so that he would not be subjected to life imprisonment. In doing so the law dictates . . . that I must take into consideration the offenses as well as the nature of the perpetrator in this case . . . .
>
> As I look at Mr. Mundy's history and . . . everything [Mundy's supporters] have communicated . . . your sentiments, your thoughts, your prayers, your faith in Mr. Mundy. [¶] Those are not factors, however, that would support the court under a legal analysis to strike the strikes. The things that the court looks for is whether or not this new offense is one that is less serious perhaps than the original strikes that someone had committed. [¶] Whether

8

or not there is anyone that was injured in the commission of these felonies, whether or not the felony itself is what we consider a serious or violent felony. . . .

[Mundy's strikes are residential burglaries.] [¶] . . . [¶] . . . I listened to the evidence in the trial. . . . I have been doing this for 18 years. This is not the first residential burglary case that I have . . . heard as a trial judge . . . . For the most part someone will go into someone's house and find something that they will think is of value and they will take it and leave. [¶] In these . . . burglaries, Mr. Mundy, it stands out to the court that you spent a substantial period of time in each of these individuals' homes. You went through almost absolutely everything they owned. You ransacked their residence. You just didn't go in and take what you wanted. Their houses were turned upside down. Every statement, every testimony from the victims here was that their drawers were pulled out, furniture turned over, things were misplaced as if someone did not care at all about them.

That stood out to the Court. The other is the amount of time that it took to take the amount of property that was taken from each of these residences. It's clear to the court that there had to be some planning, you had to have known their habits, whether or not they were going to be home, when they were going to come home. They were not crimes of opportunity that may be just out of an urge. You decided to do something. This was well-planned out. It took time.

[¶] . . . [¶]

So as I try to understand . . . what was going on in your life, I look at some of the documentation that [defense counsel] provided to the court and it indicated that you were employed at this time. You were employed in a temporary construction agency. [¶] And the pay stub seems to be in and around the time that these burglaries took place. So . . . it appears to the court when you were sent out on a job you had a chance to . . . see what was happening in that community and decided what your targets were going to be.

[The crimes] were all done within a short period of time, at least the first three were. And then it appears that at least from [the] pastor's letter to the court . . . that you may have started to go to this particular church [in February 2012], where you have met the church family. [¶] . . . [I]t appears . . . that there was a period of time from perhaps February to June when this last burglary was committed by you. [¶] And then after you were arrested and bailed out, it appears that some of the service and commitment that you

9

did — there is some letters here that talks about the homeless at Thanksgiving and that must have been in 2012, while these charges were pending. . . .

[¶] . . . [¶]

. . . I am entrusted to uphold the law of the state of California and in doing so try to apply as much compassion and understanding as I possibly can. I see your family members, your friends. . . . [T]hey are in pain, they hurt. They hurt for you. They hurt for the losses that they will have. [¶] Your kids will miss you. . . .

Mr. Richardson has spoken this morning the best he could under the emotional trauma I know he is experiencing. The other folks that did not come to court to speak, for whatever reasons they didn't come. But there are victims on both sides, Mr. Mundy. There are victims on both sides and the reality and the bottom line is no one had control over this but you.

. . . And maybe drugs is a large part of the reasons that you did what you did, but you did what you did, Mr. Mundy. So at this stage of this proceeding it's important to understand that I could exercise discretion because of my compassion, because of my compassion for your family members who are suffering and I don't want to see those things. I would like to the ease their pain to the extent I have the ability to do that. But those are not legal reasons. Those are not reasons that will stand up in an appellate court.

Your [strike] convictions were 2004, residential burglaries. . . . I believe you were sentenced to four years state prison. . . . And from that period of time [after you were released], you have had a couple of other convictions. They have been minor, but these offenses are the ones that I believe the Legislature has put into place this law because it is the same offense.

There is nothing that I can find, Mr. Mundy, that will justify me striking your strikes other than compassion and not wanting to see you do a life sentence. And those are the very reasons that the Supreme Court has said that the court may not exercise its discretion to avoid a penalty that the public has pretty much demanded. And so for those reasons, I'm not prepared to strike any strikes in the case."

Defense counsel then reiterated the arguments asserted in her sentencing memorandum:

"I just want to state for the record I did include in my briefs some reasons that the court could justify striking his strike prior. The fact that the strike priors are from 2004, that other than his residential burglaries he had no criminal history related to violence. They are mostly drug and theft related. He does display remorse for his conduct. He has his criminal history as a result of . . . his addiction to controlled substances. He didn't use a weapon in any of these offenses and no one was injured. And he does demonstrate a willingness and ability to rehabilitate himself.

[T]he Three Strikes Law is a . . . life sentence in this case, and it would be disproportionate to the current offense. I think that the court can reach a large enough determinate term with all the counts and the five-year priors, that that would reach the sentencing objectives that the court has to protect the community, to punish Mr. Mundy appropriately. . . ."

The court responded:

[T]he court considered those [factors] . . . . The bottom line is I go back to Mr. Mundy's history . . . . [T]his has been happening since 1995, since he was 14 years old. . . . It has not stopped and he has residential burglary convictions in the last ten years. Those are serious, violent felonies under the law. If you disagree, deal with the voters.

Going to someone's home, it takes away any sense of security that any individual has. That's the safest place you can hope for is your own home. When that has been violated, you have been violated, your life has been violated. And you are right, there are no physical injuries but the demonstrative comments by Mr. Richardson, there is certainly psychological, emotional that may never be overcome."

The court then imposed a sentence of 44 years plus 100 years to life, composed of the following: (1) 25 years to life each for the four first degree burglary convictions, plus two five-year terms for the serious felony prior for each burglary conviction (§§ 667, subd. (a)(1), 668, 1192.7); and (2) doubling the low term (two years) for the Vehicle Code section 10851 conviction. The court struck the prison prior as it related to each of the burglary counts. The court also ordered Mundy to pay victim restitution, restitution fines, and other fees.

11

DISCUSSION

I. *Sentence Was Not Cruel or Unusual Punishment*

Mundy contends his lengthy sentence constitutes cruel and unusual punishment in violation of the United States and California Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) We reject this contention. Under applicable legal standards, Mundy's sentence does not violate the federal or state Constitution.

A sentence violates the federal constitutional proscription against cruel and unusual punishment if the punishment is grossly disproportionate to the severity of the crime. (See *Graham v. Florida* (2010) 560 U.S. 48, 59-60; *Ewing v. California* (2003) 538 U.S. 11, 21 (*Ewing*).) When evaluating the constitutionality of a punishment, the court examines all of the circumstances of the case, including the offender and the nature of the offenses. (See *Graham, supra*, 560 U.S. at pp. 59-60; *Solem v. Helm* (1983) 463 U.S. 277, 290-291.) "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences [are] exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.) On appeal, we resolve factual disputes in favor of the judgment, and independently review the issue of constitutionality. (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358; see *In re Coley* (2012) 55 Cal.4th 524, 560.)

When punishment is imposed under the Three Strikes scheme, the defendant is not being punished merely for the most recent offense, but also for recidivism. (*People v. Mantanez, supra*, 98 Cal.App.4th at p. 366.) Thus, extended punishment under the Three Strikes law can justifiably be imposed on defendants who repeatedly commit felonies without running afoul of the constitutional proscription against cruel and unusual

12

punishment. (*Ewing, supra*, 538 U.S. at pp. 29-30; see *Lockyer v. Andrade* (2003) 538 U.S. 63, 70-77 (*Andrade*).) However, a defendant may prevail on a cruel and unusual punishment challenge if the "current offense bears little indication [the defendant] has recidivist tendencies to commit offenses that pose a risk of harm to the public." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1080; see *In re Coley, supra*, 55 Cal.4th at p. 531.)

In *Ewing,* the court sentenced the defendant to 25 years to life under California's Three Strikes law for stealing three golf clubs, as a petty theft with a prior theft conviction. (*Ewing, supra*, 538 U.S. at pp. 18, 20.) His criminal history included theft-based convictions, battery, burglary, possessing drug paraphernalia, appropriating lost property, possessing a firearm, and trespassing. (*Id.* at p. 18.) In rejecting the defendant's cruel-and-unusual punishment challenge, Justice O'Connor, writing for a plurality, found the sentence was "not grossly disproportionate," stating: "In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism. Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions. . . . To give full effect to the State's choice of this legitimate penological goal, our proportionality review of Ewing's sentence must take that goal into account." (*Id.* at pp. 29, 30-31.) Justices Scalia and Thomas agreed that Ewing's sentence did not violate the federal Constitution, but wrote separately to express the view that the Eighth Amendment does not contain a proportionality guarantee. (See *id.* at pp. 31-32 (conc. opn. of Scalia, J.); *id.* at p. 32 (conc. opn. of Thomas, J.).)

13

In *Andrade*, the petitioner stole five videotapes worth $84.70 from a store and, two weeks later, stole four videotapes worth $68.84 from another store. (*Andrade, supra*, 538 U.S. at p. 66.) He was convicted of two counts of petty theft with a prior conviction, and sentenced under the Three Strikes law to two consecutive 25-year-to-life terms. (*Id.* at pp. 67-68.) His criminal history consisted primarily of theft/burglary and drug convictions. (*Id.* at pp. 66-67.) After a California appellate court held the sentence did not violate the Eighth Amendment, the United States Supreme Court held the petitioner was not entitled to federal habeas relief because the California court's application of the "gross disproportionality principle" was not unreasonable. (*Id.* at p. 77.) The court stated that the gross disproportionality rule "reserves a constitutional violation for only the extraordinary case." (*Ibid.*)

Here, as in *Ewing* and *Andrade*, Mundy's lengthy sentence was not unconstitutional because it was properly based on his recidivist conduct. Despite multiple criminal punishments as a juvenile and as an adult, he chose to continue his criminal behavior. He committed several residential burglaries in 2004, resulting in his two prior strikes and a prison term. The fact that Mundy elected to repeat (four times) the very same serious and violent offense (§§ 667.5, subd. (c)(21), 1192.7, subd. (c)(18)) for which he had received strike priors and which resulted in prison confinement supports the court's conclusion that he is (and would continue to be) a recidivist offender.

The nature of the offenses supports a proportionality finding. Residential burglary is a highly serious offense that poses a substantial risk to human life because of " 'the danger that the intruder will harm the occupants in attempting to perpetrate the intended

14

crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.' " (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1281.) The fact that a residential burglary is committed under fortuitous circumstances where no one is at home and no one is actually injured does not detract from the highly invasive and risk-fraught nature of the crime.

Mundy's personal characteristics do not reflect that the indeterminate life sentences are grossly disproportionate. Although he has a history of drug addiction, this is not a case in which punishment was imposed on a defendant who committed a relatively innocuous offense to support a drug habit. Mundy has *persisted* in committing offenses that violate the sanctity of people's homes. Mundy's community involvement, employment opportunities, and participation in drug treatment programs support—rather than undermine—the propriety of the sentence. Despite having these opportunities and resources and strong family support, and being aware that his continued dangerous criminal behavior would result in serious punishment, Mundy chose to repeat his serious offenses—in four separate homes. He further elected to do so in a destructive and aggressive manner, ransacking the residences and rummaging through the highly personal items in each home, showing a complete disrespect and disregard for the homeowners. The circumstances support the court's finding that Mundy remains a serious danger to society and his conduct warrants a lengthy sentence.

To support his unconstitutionality claim, Mundy argues his sentence greatly exceeds the sentencing range applicable to residential burglary and is more severe than the punishment imposed for many extremely violent crimes such as first degree murder.

15

This contention is unavailing because Mundy's lengthy imprisonment term is not merely for the four instances of residential burglary, but also for his recidivist conduct of engaging in the same serious offense notwithstanding his previous convictions and punishments.

Mundy's sentence is not cruel and unusual under the federal Constitution.

We reach the same conclusion under the "[c]ruel *or* unusual" prohibition in the California Constitution. (Cal. Const., art. I, § 17, italics added.) Although some courts have interpreted the state and federal Constitutions' provisions slightly differently, Mundy acknowledges the analysis is materially similar in this case. (See *People v. Mantanez, supra*, 98 Cal.App.4th at p. 358, fn. 7; see also *People v. Cunningham* (2015) 61 Cal.4th 609, 670-671; *People v. Cole* (2004) 33 Cal.4th 1158, 1235.) Both Constitutions bar punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant. (*Solem v. Helm, supra*, 463 U.S. at p. 288; *People v. Dillon* (1983) 34 Cal.3d 441, 450, 478, fn. 25, disapproved on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186.) Under both constitutional prohibitions, the court considers the nature of the offense and the defendant, the punishment for more serious offenses within the jurisdiction, and the punishment for similar offenses in other jurisdictions. (*Solem v. Helm, supra*, 463 U.S. at pp. 290-291; *In re Lynch* (1972) 8 Cal.3d 410, 425, 431, 436.)

A prison sentence violates the California Constitution if it is "so disproportionate to the crime . . . that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra*, 8 Cal.3d at p. 424.) For the reasons discussed above,

16

Mundy's lengthy prison sentence does not shock the conscience or offend fundamental notions of human dignity.

## II. *Discretionary Decision Not To Dismiss Strike Priors*

A trial court has the discretion to dismiss a strike prior conviction if, in light of the nature and circumstances of the current and prior felony convictions and the particulars of the defendant's background, character, and prospects, the defendant is deemed outside the spirit of the Three Strikes law in whole or in part. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) However, the Three Strikes law "establishes a sentencing norm, [and] carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. . . . [T]he law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony* (2004) 33 Cal.4th 367, 378.) On appeal, we review the trial court's decision for abuse of discretion. (*Id.* at p. 374.) The defendant has the burden to clearly show the sentencing decision was "so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.)

For many of the same reasons discussed above, Mundy has not shown the trial court abused its discretion in declining to dismiss his strike priors. The court's detailed reasoning shows it properly considered the relevant factors, and did not merely apply a "mechanical[]" analysis. The trial court reasonably concluded that Mundy was not outside the spirit of the Three Strikes law because he deliberately chose to repeat the same serious criminal behavior, and did so in an aggressive and callous manner. Although his prior strikes occurred seven years earlier, Mundy had not remained crime

17

free and had committed battery and driving-under-the-influence crimes. Further, the trial court reasonably found that his drug addiction history did not justify a lighter sentence. The facts showed Mundy was participating in a drug treatment program in 2011 and in 2012 when he committed the crimes, and he had failed to learn from this program or from his previous convictions and punishment.

Mundy suggests the court placed insufficient weight on the fact that his offenses did not involve physical violence. However, the court found his offenses caused substantial emotional and psychological trauma to his victims (as demonstrated by Richardson's statements), and they presented a high risk of violence if a resident had returned home while Mundy was in the house (the evidence showed he brought a knife to at least one burglary). We likewise find unavailing Mundy's reliance on his family and community support. The court carefully considered the supporting statements and expressed compassion for Mundy's family, but properly found this compassion was not a valid ground to dismiss Mundy's prior strike convictions. As for Mundy's reliance on his involvement in his Church, the court reasonably found several factors mitigated the significance of this involvement. For example, the court noted that a letter from Mundy's pastor showed Mundy began attending this Church shortly after committing the first three burglaries, and that Mundy continued to commit crimes despite his Church attendance. The court also observed that many of Mundy's good deeds mentioned in the support letters were performed while the charges in this case were pending.

The Three Strikes law was "devised for the 'revolving door' career criminal, and was expressly intended 'to ensure longer prison sentences' " for individuals who commit

18

qualifying second and third strikes.  (*People v. Strong* (2001) 87 Cal.App.4th 328, 331-332, fn. omitted; *People v. Gaston* (1999) 74 Cal.App.4th 310, 320.)  Although the voters recently amended the law to provide relief for certain individuals whose third strike is not a serious or violent felony, Mundy does not fit into this category.  (See §§ 1170.2, subd. (c)(2)(C), 667, subd. (e)(2)(C).)  Mundy is precisely the type of recidivist offender targeted by the Three Strikes law.

Mundy asks us to reweigh the evidence because of the severity of the sentence.  This is not the proper role of an appellate court.  This court does not reevaluate the relevant factors or substitute its judgment for that of the trial court.  We will not interfere with the trial court's exercise of discretion when it considered all facts bearing on the offense and the defendant to be sentenced.

## DISPOSITION

Judgment affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

19